# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 9, 2015

**NO. 33,669**

**CHRISTOPHER J. DOLLENS, individually and as Personal Representative of the Estate of James E. Dollens, Deceased, and SANDRA EVANS,**

      Plaintiffs-Appellees,

v.

**WELLS FARGO BANK, N.A., Successor by merger to WELLS FARGO HOME MORTGAGE, INC.,**

      Defendants-Appellants,

and

**THE DUHIGG LAW FIRM and STEWART BUTLER, ESQ.,**

      Plaintiffs-Appellees,

v.

**WELLS FARGO BANK d/b/a WELLS FARGO HOME MORTGAGE d/b/a WELLS FARGO HOME MORTGAGE CPI NUMBER 708,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Beatrice J. Brickhouse, District Judge**

The Duhigg Law Firm
Katy M. Duhigg
John J. Duhigg
Albuquerque, NM

Treinen Law Office, P.C.
Rob Treinen
Albuquerque, NM

for Appellees

Moses, Dunn, Farmer & Tuthill, P.C.
Alicia L. Gutierrez
Mark A. Glenn
Albuquerque, NM

Snell and Wilmer, L.L.P.
Andrew M. Jacobs
Tucson, AZ

for Appellants

**OPINION**

**VANZI, Judge.**

{1} Wells Fargo appeals from a judgment awarding substantial attorney fees and punitive damages based on a "small disputed amount" of out-of-pocket damages. On appeal from *Dollens v. Wells Fargo*, No. CV-2011-05295, Wells Fargo contends that the district court erred by finding that Wells Fargo breached its contract with James Dollens (Decedent), that it violated the covenant of good faith and fair dealing and the Unfair Practices Act, and that it engaged in "wrongful foreclosure." Wells Fargo also contends that the district court erred in awarding attorney fees and punitive damages under the present circumstances and, finally, asks us to address issues that were raised in the separate, but since-consolidated, attorney fee litigation in *Duhigg Law Firm v. Wells Fargo*, No. CV-2011-10129. We affirm in part and reverse in part. Specifically, we remand for reconsideration of the award of attorney fees and damages as more fully explained in this Opinion.

**BACKGROUND**

{2} On April 4, 2003, Decedent borrowed $133,700 on a thirty-year note to buy a home. The note was secured by a mortgage, which was serviced by Wells Fargo for the owner/investor Freddie Mac. Wells Fargo later marketed to Decedent a mortgage accidental death insurance policy that was underwritten by the Minnesota Life

Insurance Company (Minnesota Life). Decedent purchased the policy and timely paid his monthly premiums and mortgage payments directly to Wells Fargo, which was designated as the policy holder and beneficiary under the certificate of insurance. The certificate provided that the purpose of the policy was to "reduce or extinguish the insured loan" in the event Decedent was to suffer an accidental death, which was defined subject to various exclusions. In short, Minnesota Life would pay out the insurance proceeds upon receipt of proof in writing that Decedent suffered a qualifying death, which Wells Fargo would then apply to pay off or pay down the loan.

{3}     Decedent died on August 18, 2010. Wells Fargo was notified of the death by August 24, 2010, by Decedent's widow and also by his son, Christopher Dollens (Dollens), who was the personal representative of the Estate. Dollens told Wells Fargo he would not be able to make payments on the mortgage and that he intended to sell his father's home to cover the Estate's debts. According to evidence later presented at trial, Wells Fargo made no mention in these communications of the existence of the accidental death insurance policy, which, in theory, could have paid off the balance of the loan. The loan became delinquent shortly thereafter, and Wells Fargo began various efforts at collection—sending form letters and notices, leaving

telephone messages seeking payment, and eventually, on February 9, 2011, initiating foreclosure proceedings against the home.

{4} Meanwhile, in October and November 2010, Dollens apparently learned of the accidental death policy and submitted a claim on behalf of the Estate to Minnesota Life in the manner prescribed by the certificate of insurance. On January 10, 2011, attorneys for the Estate sent a copy of the death certificate with a letter to Wells Fargo asking it for "a suspension and . . . dismissal of the claim[ed] mortgage debt" in light of the pending claim. The death certificate described the cause of death as "[m]ultiple blunt force injuries" and the manner of death as "[u]ndetermined." A checkbox for "[a]ccident" remained unchecked. For reasons that were never adequately explained at trial, Wells Fargo did not respond to the letter.

{5} On February 3, 2011, Minnesota Life wrote to Wells Fargo, confirming that a claim was pending and requesting that it delay any adverse action on the account. Instead, Wells Fargo completed a Notice of Death form for Minnesota Life—indicating the amount due on the note at the time of Decedent's death—and moved ahead with foreclosure. Minnesota Life denied Decedent's claim in May 2011 but then reversed its denial several months later, eventually paying Wells Fargo the accidental death benefit on October 5, 2011.

{6}    In the interim, between Decedent's death and Minnesota Life's payment of the insurance proceeds, delinquency and default gave rise to various costs that Wells Fargo charged to the mortgage account. These included late fees for delinquent months, foreclosure attorney fees, and charges for inspecting and preserving the property. Adding these costs to the amounts on the note, Wells Fargo determined that the insurance proceeds were now insufficient to pay off the loan, and in a highly disputed transaction, it applied the funds to pay all fees, bring the loan current, and reduce the principal and interest on the note, reinstating the mortgage with a remaining principal balance of $4,416.45. Despite bringing the account current, Wells Fargo did not dismiss its foreclosure action for several months.

{7}    The Estate did not make another monthly mortgage payment until February 13, 2012, thus accruing additional late fees and property inspection fees. The February payment brought the loan current for a second time, now with a total principal balance of $1,842.71. But the account was soon in default again, and the Estate made no further payments. Fees continued to accrue until Wells Fargo stopped servicing the loan on September 18, 2012.

{8}    Dollens, Decedent's daughter (Sandra Evans), and the Estate (collectively, the Estate) filed suit against Wells Fargo and Minnesota Life, alleging numerous violations by Wells Fargo, including breach of contract, "breach of the covenant of

4

good faith and fair dealing and wrongful foreclosure," violations of the Unfair Practices Act (UPA), violations of the Home Loan Protection Act, and for attorney fees pursuant to NMSA 1978, Section 48-7-24 (1983).[1] All claims against Minnesota Life were settled in a stipulated order dated November 19, 2012, leaving Wells Fargo as the lone defendant in *Dollens v. Wells Fargo*, No. CV-2011-05295, and in *Duhigg Law Firm v. Wells Fargo*, No. CV-2011-10129, which was a related action demanding that a portion of the accidental death benefit be paid to the Estate's attorneys as additional attorney fees on theories of unjust enrichment, the common fund doctrine, and equitable attorney's charging lien. The two cases were eventually consolidated, and the district court held a bench trial in which the plaintiffs in *Dollens* and *Duhigg* prevailed on all claims except the Home Loan Protection Act. The judgment awarded general damages of $15,633.42,[2] attorney fees of $390,654.34, costs of $48,397.10, and punitive damages of $2,728,109.16 in *Dollens* and separate attorney fees of $51,189.08 in *Duhigg*. This appeal followed.

[1]Throughout this litigation, the parties and the district court have consistently treated wrongful foreclosure, which has apparently never been recognized in New Mexico, as a redundancy of the doctrine of good faith and fair dealing. We do not attempt to define the elements of this novel claim for the first time on appeal.

[2]The parties have since stipulated that the district court awarded excess out-of-pocket damages in error. The appropriate amount of disputed general damages is $4,221.73.

# DISCUSSION

## Standard of Review

{9} The district court's factual determinations are reviewed for substantial evidence. The appellate courts "cannot substitute our judgment of the facts for that of the trial court since only the trier of facts may weigh the evidence, determine the credibility of witnesses, reconcile inconsistent or contradictory statements of witnesses, and decide where the truth lies." *Lewis v. Bloom*, 1981-NMSC-051, ¶ 4, 96 N.M. 63, 628 P.2d 308. However, "when the resolution of the issue depends upon the interpretation of documentary evidence, this Court is in as good a position as the trial court to interpret the evidence." *Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 18, 320 P.3d 1 (alteration, internal quotation marks, and citation omitted).

## Liability for Out-of-Pocket Damages

{10} The district court's findings on liability are less than clear. It is difficult to determine which conduct justified the court's findings as to each claim. Our best interpretation is that the various claims can be distilled to three theories ruled on by the district court: (1) Wells Fargo failed to implement any protection from foreclosure for home buyers, including Decedent, who purchased a mortgage accidental death insurance policy that it marketed and sold on behalf of Minnesota Life; (2) it engaged in a widespread, automated practice of charging unreasonable fees, including dubious

6

property inspection and preservation fees; and (3) it misapplied to these spurious fees and costs the insurance proceeds that should have been applied to first pay off the mortgage.

{11} While the second and third theories relate to the substance of particular fees and the specific procedure employed in applying the insurance proceeds when they were finally received, the first theory formed the Estate's primary argument that *no fees* were valid because Wells Fargo had a duty to protect from default purchasers of the accidental death insurance policies that it markets and sells for that specific purpose. This duty, according to the Estate, would have obligated Wells Fargo to pursue the insurance proceeds, of which it was aware, and to which it would be entitled, on behalf of the mortgage account or to suspend or waive collection of payments while the insurance claim was pending. Along these lines, the Estate argued at trial that the alleged out-of-pocket damages all flowed from Wells Fargo's actions with respect to the accidental death insurance policy, whether or not Wells Fargo later misapplied funds or otherwise violated its obligations as servicer of the mortgage.

{12} We note that nothing in the mortgage or note itself bound Wells Fargo to suspend collection of payments on Decedent's account, waive any fees while a claim is pending, or otherwise assist the Estate in pursuing a claim for insurance benefits. To the contrary, Decedent, and by extension the Estate, covenanted to pay "principal

7

and interest by making a payment every month." Despite the language in the mortgage and note, the Estate argued—and the district court agreed—that other sources of an obligation to Decedent arose from Wells Fargo's service agreement with Freddie Mac, from an "implied promise to protect [Decedent's] reasonable expectations under the [mortgage] contract," and from deceptive conduct and misrepresentations that it made to Decedent when it marketed and sold the accidental death insurance policy in violation of the UPA. Since we ultimately conclude that Wells Fargo has not met its burden on appeal to overcome the district court's finding of a UPA violation, we only address the remaining bases for liability to the extent they are relevant to attorney fees or punitive damages.

**The UPA Violation**

{13}   In essence, the district court determined that Wells Fargo profited from its relationship with Minnesota Life by representing the insurer and acting as its "licensed agency" and by using its access to its borrowers to market and sell mortgage accidental death policies in exchange for a percentage of the premiums. Within this context, Wells Fargo made a representation to Decedent that the policy would protect his "family's financial security," though it had no system in place to "make claims or otherwise assist estates, and no intent to provide the protection promised in the sale of the policy." The district court concluded that the totality of this conduct constituted

8

a pattern of willful conduct that caused damages to the Estate for which it is entitled to compensation.

{14} "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." NMSA 1978, § 57-12-3 (1971). There are eighteen enumerated unfair or deceptive practices in the UPA, *see Hicks v. Eller*, 2012-NMCA-061, ¶ 17, 280 P.3d 304, some of which were specifically referenced by the district court. We have previously evaluated "this somewhat complicated statutory scheme and clarified that there are three essential elements to a UPA claim." *Id.* ¶ 18. A successful plaintiff must prove:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

*Id.* (internal quotation marks and citation omitted); *see Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 17, 125 N.M. 748, 965 P.2d 332 ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."). In addition, the UPA imposes an affirmative duty "to disclose material facts reasonably necessary to

prevent any statements from being misleading." *Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 15, 135 N.M. 265, 87 P.3d 545.

{15}     On appeal, Wells Fargo does not attempt to apply or even mention any of these requirements, asserting instead that it was entitled to foreclose based on the mortgage, note, and its service agreement with Freddie Mac, and that it "lacked the authority to have committed an unfair practice in its peripheral role in relation to the [Minnesota Life] Policy." Wells Fargo misunderstands both the nature of the allegations against it and the findings below which, as we understand the district court, established that Wells Fargo treated Decedent differently from borrowers who have not purchased these deceptively marketed insurance policies. *See Corona v. Corona*, 2014-NMCA-071, ¶ 26, 329 P.3d 701 ("The appellate court presumes that the district court is correct, and the burden is on the appellant to clearly demonstrate that the district court erred."). The district court apparently determined that, by assuming a profitable function as the agent of its borrower, and as the "licensed agency" representing Minnesota Life in the sale of mortgage accidental death insurance policies for which it is a policyholder and a beneficiary, Wells Fargo knowingly created the perception that it would have some system in place or take some active role in the claims process to protect Decedent's "family's financial security" in the event of an accidental death.

10

{16}    We question whether a vague, post-sale promise to protect financial security would tend to deceive a reasonable person into believing that Wells Fargo had any concrete obligation in relation to the policy. Wells Fargo could have cited relevant authorities and argued that the statement was not false or misleading—perhaps that it was non-actionable puffery. *See Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 84, 150 N.M. 283, 258 P.3d 1075. Or Wells Fargo could have challenged on substantial evidence grounds the relevant factual premises that the district court relied on, including its findings as to the purported existence of various agency relationships. *See Bozza v. Gen. Adjustment Bureau*, 1985-NMCA-068, ¶ 13, 103 N.M. 200, 704 P.2d 454 (stating that whether an agency exists is properly addressed by the trial court as a question of fact). It did not. Instead, Wells Fargo asserts only that, as a servicer of a mortgage, it can always foreclose at will upon default, subject only to the terms of the mortgage and its servicing agreement—an overbroad, unclear, and unsupported assertion that we must reject[3]—and that its role in the insurance

---

[3]Wells Fargo specifically argues that actions it took as a servicer while the mortgage was in default cannot constitute a violation of the UPA. That seems to be a broad rule that would immunize loan servicers from all types of deceptive conduct. In support of its argument, Wells Fargo provides an unexplained citation to a specific paragraph of *Jaramillo v. Gonzales*, 2002-NMCA-072, ¶ 26, 132 N.M. 459, 50 P.3d 554. We have tried mightily to understand how that paragraph, or that case, which held that a bank's refusal to acknowledge liability to buyers under the FTC Holder Rule amounted to a UPA violation, *id.* ¶ 31, supports Wells Fargo's position. We conclude it does not.

11

matter was peripheral. Such a position is inadequate to define a defense.

{17} The language of the UPA encompasses "a broad array of commercial relationships" and does not require a direct transaction between a plaintiff and a defendant. *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶¶ 21, 32-33, 142 N.M. 437, 166 P.3d 1091. Thus, for instance, we held in *Maese v. Garrett* that it was immaterial that the plaintiffs did not specifically compensate the defendants for financial services rendered, where the defendants received compensation from third parties for investment advice that led the plaintiffs to purchase their products. 2014-NMCA-072, ¶ 19, 329 P.3d 713, *cert. denied*, 2014-NMCERT-006, 328 P.3d 1187. For Wells Fargo's "peripheral role" argument to be successful on appeal, we would expect it to attack the district court's underlying factual findings or otherwise distinguish its relationship with Decedent and Minnesota Life from the "broad array of commercial relationships" covered by the UPA. *See* Rule 12-213(A)(4) NMRA (providing that "[a] contention that a verdict, judgment or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence"); *Armijo v. Via Dev. Corp.*, 1970-NMSC-015, ¶ 3, 81 N.M. 262, 466 P.2d 108 (stating that facts that are not challenged "become facts in the reviewing court"); *Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶ 18, 115 N.M. 181, 848 P.2d 1108

12

("[A]n appellant is bound by the findings of fact made below unless the appellant properly attacks the findings, and . . . the appellant remains bound if he or she fails to properly set forth all the evidence bearing upon the findings."); *In re Estate of Heeter*, 1992-NMCA-032, ¶ 15, 113 N.M. 691, 831 P.2d 990 ("This [C]ourt will not search the record to find evidence to support an appellant's claims."). Wells Fargo has done neither.[4]

{18}     We have been left to grapple with a series of findings and conclusions that, while lengthy, are unclear, and without any assistance from an appellant that instead chose to minimize the arguments against it with virtually no discussion of the applicable law or the facts contrary to the argument advanced. For example, Wells Fargo did not address the district court's finding that it ignored a request from Minnesota Life to suspend foreclosure proceedings during the pendency of the claim. While the particular details of a system to protect borrowers who purchase mortgage accidental death insurance may not be obvious, the district court could reasonably conclude that, at a minimum, Decedent purchased the insurance policy expecting that

---

[4]The closest thing we can find to a substantial evidence challenge on this issue is Wells Fargo's "summary of relevant facts" portion of its brief, which cites repeatedly to its own proposed findings and conclusions, without acknowledging that many of those proposed findings were expressly rejected by the district court. We caution Wells Fargo against making such misleading representations on appeal in the future.

13

Wells Fargo would honor a request of the insurer whose policy it sold not to foreclose while a claim is pending or to otherwise credit back to the account any fees that were incurred while the insurer processed the claim. Evidence that the two entities, Wells Fargo and Minnesota Life, were so intertwined in this process as to create a reasonable expectation that they would communicate and work together to prevent foreclosure during a pending claim has not been effectively challenged on appeal, and "[w]e will not review unclear arguments, or guess at what [those] arguments might be." *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076. For this reason alone, we affirm the determination that Wells Fargo violated the UPA and is liable for the Estate's out-of-pocket damages.

**Attorney Fees**

{19}    Wells Fargo next challenges several aspects of the attorney fee award. It argues first that it had no meaningful opportunity to contest the Estate's attorney fee affidavit, which was submitted in its closing argument reply brief, and second, that any award granted pursuant to Section 48-7-24 for a violation of NMSA 1978, Section 48-7-4 (1991) was error as a matter of law. Wells Fargo also challenges the district court's conclusion that attorney fees under the UPA are compensatory damages that can form the basis for a punitive damage award. We address the first two arguments and conclude that remand is necessary to allow Wells Fargo an

14

opportunity to respond to the requested attorney fees under the UPA. We further conclude that reversal is appropriate with respect to Section 48-7-24. Since we vacate the existing award of attorney fees, we need not decide whether those fees can be considered compensatory damages in a post-trial punitive damage analysis. *See Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 36, 137 N.M. 26, 106 P.3d 1273 ("A reviewing court generally does not decide academic or moot questions.").

{20} A party opposing a motion for attorney fees must be afforded an opportunity to respond. *See* Rule 1-054(E)(3) NMRA. However, peculiar circumstances at the close of the bench trial prevented Wells Fargo from disputing the Estate's attorney fee affidavit. Wells Fargo twice objected during trial to a proposed schedule that would have had the parties submitting simultaneous written closing arguments. The basis for the objection was, in part, that such a procedure would prevent it from meaningfully responding to any alleged attorney fees if the Estate submitted a fee affidavit for the first time during closing argument. Ultimately, the court and the parties agreed to a written closing argument schedule that would take place over the course of several months in a manner similar to motion practice: the Estate would close, arguing liability and damages; Wells Fargo could respond; and the Estate could then file a reply. Significantly, since attorney fees depended on the statutory claims,

15

*see Dean v. Brizuela*, 2010-NMCA-076, ¶ 16, 148 N.M. 548, 238 P.3d 917 ("[I]t has long been the rule in New Mexico that a party is only entitled to those fees resulting from the cause of action for which there is authority to award attorney fees."), the court also ordered that the issue of fees would not be litigated until after entry of judgment because "[y]ou've got to get [to] liability first . . . before we would ever get to a discussion about that."

{21} As instructed, the Estate submitted its closing argument in writing. It argued that Wells Fargo's conduct justified an award of damages of $15,633.42 and a punitive damages award of "at least $5,000,000." In response, Wells Fargo asserted that the Estate's claim for damages would result in a ratio of compensatory to punitive damages of 700 to 1 in likely violation of its right to due process according to several decisions of the United States Supreme Court. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) (stating that a ratio of 500 to 1 "must surely raise a suspicious judicial eyebrow" (internal quotation marks and citation omitted)). To overcome this argument, the Estate contended for the first time in its reply that the court should now award "compensatory damages of $495,012.29" based on out-of-pocket damages plus attorney fees and punitive damages of ten times that amount. The Estate then submitted an attorney fee affidavit before the court issued its judgment or concluded whether attorney fees would even be available under any or

16

all statutory claims. In a series of motions and responses, the parties disputed whether the early fee affidavit was proper, whether it violated the court's order to reserve argument on attorney fees until after trial, and whether Wells Fargo was prejudiced by it. Wells Fargo's request for hearing on the matter was not granted.

{22}     The district court then issued a letter decision, finding for the Estate on multiple claims and treating attorney fees under the UPA and Section 48-7-24 as compensatory damages for the purpose of applying the *Gore* ratio. The district court awarded substantial attorney fees of $390,654.34 and punitive damages of $2,728,109.16. It did so without indicating how it arrived at these figures or why they are less than the amounts requested by the Estate. The court concluded that Wells Fargo "waived the right to provide rebuttal argument/evidence" on the issue of attorney fees when it failed to request an unopposed surreply and when it failed to "address the reasonableness of the fees" in its various motions and objections. The court also determined that Wells Fargo did not establish prejudice as a result of the affidavit being submitted with the reply. We disagree on all points, and we remand to the district court to afford the parties an opportunity to actually litigate the issue that ultimately justified more than $3,000,000 in damages.

{23}     First, Wells Fargo cannot have waived its right to respond to the attorney fee affidavit by adhering to the court's order not to litigate the reasonableness of attorney

17

fees until after liability was established. *See State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 1995-NMSC-033, ¶ 11, 120 N.M. 1, 896 P.2d 1148 (stating that "a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions"). Nor can it have waived its right to respond to the affidavit by failing to request a surreply, which, even if unopposed, requires leave of the court and is only granted as a matter of discretion. *See* Rule 1-007.1 NMRA (providing only for motion, response, and reply); LR2-120(A) NMRA (requiring prior court approval for the filing of briefs and statements of supporting points and authorities for unopposed motions). Second, Wells Fargo was necessarily prejudiced. It could not have meaningfully evaluated or responded to the premature attorney fee affidavit without knowing whether the Estate prevailed on claims authorizing attorney fees, and if so, which claims. The Estate pleaded distinct violations under three separate fee-authorizing statutes—the UPA, Section 48-7-24, and the Home Loan Protection Act, together with several other claims under the common law that do not authorize attorney fees: breach of contract, wrongful foreclosure, and breach of the implied covenant of good faith and fair dealing. It is settled that "an award of attorney fees under a statutory claim which allows an award for attorney fees, which is joined with non-statutory claims, must be limited to the work done on the statutory claim." *Dean*, 2010-NMCA-076, ¶ 18; *see N.M. Right to*

18

*Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 9, 127 N.M. 654, 986 P.2d 450 (stating that litigants in New Mexico are responsible for their own attorney fees absent statutory or other authority). Since, at the time the affidavit was submitted, neither party could have known which fees were actually recoverable, Wells Fargo was unable to challenge any of the non-recoverable fees, such as those related to the Home Loan Protection Act claim, which was later dismissed.

{24} Finally, we are concerned about the due process implications that arise in the unique circumstances presented here, where, after an extensive five-day bench trial with evidence of $4,221.73 in out-of-pocket damages, the court ultimately awarded punitive damages of more than $3,000,000 justified entirely, for all practical purposes, by an uncontested affidavit submitted during closing argument in violation of a prior ruling. A punitive damage award is subject to both procedural and substantive limits. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶¶ 11-12, 132 N.M. 401, 49 P.3d 662. Thus, "in order to afford meaningful review of the substantive aspect of the punitive damage award in this case," we would first have to determine that "the procedures used to arrive at the award were fair." *Id.* ¶ 12. In light of the above discussion, we cannot say that Wells Fargo had a real opportunity to contest the bulk of the purported "compensatory" damages that formed the basis for the punitive damage award. Even

assuming—without deciding—that attorney fees under the UPA can be treated as compensatory damages for the purpose of applying the *Gore* ratio in post-trial review, at a minimum, Wells Fargo must first have a real opportunity to challenge the reasonableness of the fees alleged, *see* Rule 1-054(E)(3), and the district court must ensure that only recoverable fees are being awarded. *See Dean*, 2010-NMCA-076, ¶ 17; *Jaramillo*, 2002-NMCA-072, ¶ 41 (stating that when a UPA claim is "the only claim for which [the p]laintiff could be awarded attorney fees, the trial court [is] obligated to separate the claims and determine the amount of time spent on each"). While work on some of the fee-authorizing and non-fee-authorizing claims may be "inextricably intertwined," the court should "attempt to distinguish between the two types of work to the extent possible." *Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co. of Ohio*, 1993-NMSC-010, ¶ 32, 115 N.M. 152, 848 P.2d 1079.

{25}     With respect to the substance of the fee affidavit, Wells Fargo argues that any fees under Section 48-7-24 were granted in error. We review an attorney fee award for abuse of discretion, but when the award is based on a misapprehension of the law, our review is de novo. *Atherton v. Gopin*, 2012-NMCA-023, ¶ 5, 272 P.3d 700. The Estate alleged at trial that Wells Fargo violated Section 48-7-4 by failing to record the satisfaction of the mortgage after it should have been paid in full by the accidental death insurance proceeds. The district court agreed and concluded that this violation

20

justified an award of attorney fees pursuant to Section 48-7-24. We disagree. The only relationship between Section 48-7-24 and the statute that was violated is that they have since been compiled together in Chapter 48, Article 7 of the New Mexico Statutes. The attorney fee provision was enacted as part of the "due-on-sale" law, NMSA 1978, §§ 48-7-15 to -24 (1983), and provides for attorney fees for the prevailing party in "any action brought under *this act*." *See* § 48-7-24 (emphasis added). The term "this act" refers to the due-on-sale provisions that were enacted together in 1983 and only later compiled in Article 7 with the other enactments related to mortgages. In other words, Section 48-7-24 only authorizes attorney fees for Sections 48-7-15 through -23, and there was no theory presented at trial that any of those provisions were violated. It was thus error for the district court to use an inapplicable statute as a basis for awarding any attorney fees, *see Dean*, 2010-NMCA-076, ¶¶ 16-17, and all fees resulting from Wells Fargo's violation of Section 48-7-4 must be reduced accordingly on remand. *See Klinksiek v. Klinksiek*, 2005-NMCA-008, ¶ 29, 136 N.M. 693, 104 P.3d 559 (stating that the district court should reconsider an attorney fee award when a judgment is reversed in part).

**Punitive Damages**

**A.      Availability of Punitive Damages**

{26}     The only punitive damages provided for by the UPA are treble damages if the

21

fact finder finds willful misconduct. NMSA 1978, § 57-12-10(B) (2005). "[T]o obtain punitive damages beyond those permitted by the statutory treble-damages provision, the plaintiff must establish a cause of action other than one under the UPA." *McLelland v. United Wis. Life Ins. Co.*, 1999-NMCA-055, ¶ 13, 127 N.M. 303, 980 P.2d 86; *see also Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶¶ 20-21, 110 N.M. 314, 795 P.2d 1006 (requiring election of remedies in cases where both UPA treble damages and common law punitive damages are available). In this case, common law punitive damages are only available if Wells Fargo breached a contract with Decedent via conduct that was "malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for [his] rights" or similarly breached the implied covenant of good faith and fair dealing. *Romero v. Mervyn's*, 1989-NMSC-081, ¶¶ 23-24, 32-33, 109 N.M. 249, 784 P.2d 992. This means that Wells Fargo is liable for punitive damages if it intended to commit a wrongful breach, knowing that it was wrongful when committed (*i.e.*, conscious wrongdoing). *See id.* ¶ 35; *see also Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, ¶¶ 26-28, 118 N.M. 203, 880 P.2d 300. On appeal, the Estate advances several theories justifying a punitive damage award independent of the UPA. We address each theory in turn.

**1.     Common Law Duty to Protect Insurance Purchasers From Foreclosure**

{27}     The district court concluded that Wells Fargo's failure to implement any system

22

to protect its borrower/customer from foreclosure pursuant to the Minnesota Life insurance policy independently breached the covenant of good faith and fair dealing, justifying punitive damages. However, that doctrine is inapposite as a matter of law, as it only applies to the parties of an allegedly breached agreement, *see Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 51, 133 N.M. 669, 68 P.3d 909, and Wells Fargo was not a party to the insurance policy. The Estate argued extensively below that its claim for breach of the covenant of good faith and fair dealing was based on obligations arising under Wells Fargo's service agreement with Freddie Mac, to which Decedent was a third-party beneficiary. And the district court agreed. In its findings, with respect to the covenant, the district court reasoned that Wells Fargo "failed to follow the *mandatory* Freddie Mac servicer guidelines," which, it stated, "are for the benefit of the borrower." According to the district court, "Wells Fargo was obliged to give the Estate a forbearance on the mortgage based on the Freddie Mac guidelines, and had it done so, late fees, attorney[] fees, and costs would not have been incurred, and the foreclosure would not have occurred." Thus, the court ultimately concluded that Decedent and the Estate were "third-party beneficiaries of regulations governing Wells Fargo in its servicing of the [m]ortgage[,]" and that, even if Decedent and the Estate were not third-party beneficiaries, violation of the service agreement is "evidence of . . . Wells Fargo's lack of good faith and fair dealing."

{28} Freddie Mac is a corporation chartered by Congress to purchase mortgages from approved sellers and servicers—in this case, Wells Fargo—which must in turn comply with the terms set forth in Freddie Mac's *Sellers' & Servicers' Guide* (the Guide). *See Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1404 (9th Cir. 1996). On appeal, Wells Fargo contends, among other things, that the Guide cannot be read to create contractual duties that are enforceable by borrowers. We agree.

{29} "It is a general rule of law" that, aside from third-party beneficiaries, "one who is not a party to a contract cannot maintain suit upon it." *Fleet Mortg. Corp. v. Schuster*, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 811 P.2d 81. "The paramount indicator of third party beneficiary status is a showing that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries." *Valdez v. Cillessen & Son, Inc.*, 1987-NMSC-015, ¶ 34, 105 N.M. 575, 734 P.2d 1258. Incidental beneficiaries who are neither promisees of a contract nor parties to whom performance is to be rendered, but who will derive a benefit from its performance are not third-party beneficiaries. *See Fleet Mortg. Corp.*, 1991-NMSC-046, ¶ 4.

{30} While borrowers may derive benefits from some provisions of the Guide, nothing in that document indicates that they are intended beneficiaries entitled to

24

enforce it. The plain terms of the Guide demonstrate that it exists to protect Freddie Mac's interests, incidentally benefitting borrowers when their interests align with Freddie Mac's. Thus, the contention that the Guide creates a private right of action for borrowers to exercise against mortgage servicers has been rejected by every court that has squarely considered the issue. *See McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1044 (N.D. Cal. 2013) (recognizing that "the federal courts have uniformly concluded . . . that borrowers are neither parties nor third-party beneficiaries entitled to enforce [the Freddie Mac guidelines]"); *see also Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1404 (N.D. Ala. 1997) (stating that "no provision in the Guide indicates any intent on the part of [Freddie Mac] that third parties have a right to enforce it"), *aff'd*, 140 F.3d 1043 (11th Cir. 1998); *Kariguddaiah v. Wells Fargo Bank, N.A.*, No. C 09-5716 MHP, 2010 WL 2650492, at *4 n.4 (N.D. Cal. July 1, 2010) (same); *Wells Fargo Bank, N.A. v. Sinnott*, No. 2:07 CV 169, 2009 WL 3157380, at *11 (D. Vt. Sept. 25, 2009) ("The terms of the. . . Guide make clear that it exists not for the benefit of defaulting borrowers but rather to protect Freddie Mac's interests in its loans which are serviced by other financial institutions."); *Mitchell v. Wells Fargo Bank, N.A.*, 476 B.R. 33, 55 (Bankr. D. Mass. 2012) ("[A] Freddie Mac Contract does not bestow upon third parties the right to enforce the contract[.]"). We see no basis to depart from the reasoning in these

decisions.

{31} The Estate narrows its argument on appeal. It points to decisions applying federal service agreements under the Home Affordable Modification Program (HAMP), *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581-82 (7th Cir. 2012); *Hinson v. Countrywide Home Loans, Inc.*, 481 B.R. 364, 378 (Bankr. E.D.N.C. 2012), which, it contends, establish that violation of a service agreement, while not an enforceable third-party contract, can be evidence of a defendant's lack of good faith and fair dealing. However, this Court has already rejected both the notion that borrowers have a direct cause of action to enforce HAMP regulations and the general argument that a member of the public is a third-party beneficiary entitled to enforce similar contracts in the absence of terms providing for such liability. *See Charter Bank v. Francoeur*, 2012-NMCA-078, ¶¶ 13-18, 287 P.3d 333. Our Supreme Court later relied on *Charter Bank* to reject a litigant's attempt to base "good faith and fair dealing rights" on an agreement between a loan servicer and the federal government under HAMP—the exact argument that the Estate has made in this case. *See Bank of Am. NA v. Quintana*, No. 33,611, 2014 WL 809199, dec. ¶¶ 31-32 (N.M. Sup. Ct. Feb. 27, 2014) (non-precedential). Similar to the Court in *Quintana*, we conclude that the Estate's claim for breach of the covenant of good faith and fair dealing is subsumed within its claim for breach of a duty as a third-party beneficiary to an

26

agreement between its loan servicer and Freddie Mac. *See id.* ¶ 32. It must therefore fail as a matter of law. *Charter Bank*, 2012-NMCA-078, ¶ 18. This conclusion precludes any common law punitive damages resulting from Wells Fargo's conduct with respect to the accidental death insurance claim.

**2.      Unreasonable Property Inspection and Preservation Fees**

{32}     We affirm the district court's conclusion that Wells Fargo breached the terms of the mortgage by charging unreasonable property inspection and preservation fees, thereby justifying punitive damages. Section 7 of the mortgage provides for preservation, maintenance, inspection, and protection of the property. It specifically states that "[Wells Fargo] or its agent may make reasonable entries upon and inspections of the Property[.]" The Estate presented evidence at trial that Wells Fargo made excessive "drive-by" visits to the property, charging the mortgage account for each visit, and also charging for dubious preservation work orders, including orders for "winterization" in July, and multiple orders for "grass cuts" where photographic evidence presented at trial demonstrated that there was no grass.

{33}     The Estate also presented expert testimony and cases from other jurisdictions indicating that Wells Fargo has been previously punished for similar conduct as early

27

as 2007.[5] *See Wells Fargo Bank, N.A. v. Stewart*, 647 F.3d 553, 555 (5th Cir. 2011); *Jones v. Wells Fargo Home Mortg.*, 366 B.R. 584, 589-90 (Bankr. E.D. La. 2007). Though Wells Fargo has argued on appeal that *Jones* and *Stewart* cannot be considered for the purpose of punishing it for prior conduct in other states, *see, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421-22 (2003), evidence that Wells Fargo has been previously punished for similar conduct (recidivist evidence) is appropriate to establish the type of conscious wrongdoing and reprehensibility that justifies a punitive damage award. *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 n.28 (1993). *Jones*, for instance, is just one case of a series that began in 2007, finding, in part, that Wells Fargo was charging for unnecessary property inspections upon default without any reason or any policy guidelines. 366 B.R. at 597-98. Based on this evidence, the district court was entitled to conclude that Wells Fargo breached Section 7 of the mortgage by unreasonably inspecting the property and that punitive damages were available to deter a pattern of continued misconduct.

---

[5]Wells Fargo makes a cursory assertion that the Estate's expert should not have been allowed to testify. It has done so without setting forth the standard of review or citing any authority related to the admissibility of expert testimony. We decline to review arguments that are inadequately developed on appeal. *Headley*, 2005-NMCA-045, ¶ 15.

**3. Misapplication of Funds**

{34} We also affirm the district court's finding that punitive damages are available because Wells Fargo misapplied funds to the mortgage account in breach of the mortgage and note, both when it received the insurance proceeds of $133,559.15 in October 2011, and when it later received a payment from Dollens for $3,673.89 in February 2012. According to the district court, "Wells Fargo violated the terms of the Note and Mortgage by using the insurance proceeds to pay its fees and costs before paying all interest and principal due[,]" and again by misapplying Dollens' February 2012 payment in similar fashion. This caused the note to keep a balance after funds were applied, "which resulted in the account going into default again, and Wells Fargo claiming a debt when none would have existed[.]"

{35} Section 2 of the mortgage, entitled "Application of Payments or Proceeds," provides:

> Except as otherwise described in this Section 2, all payments accepted and applied by [Wells Fargo] shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) [escrow due]. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

Section 14 of the mortgage further states:

29

> [Wells Fargo] may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting [Wells Fargo's] interest in the Property and rights under this Security Instrument, including, but not limited to, attorney[] fees, [and] property inspection and valuation fees.

In the event of default, Section 6 of the note provides that, upon acceleration of the loan, Wells Fargo "will have the right to be paid back . . . for all of its costs and expenses in enforcing this Note," including reasonable attorney fees. Taken together, we read the plain terms of the mortgage and note to have required the following mandatory application of the insurance proceeds in this case: (1) All interest due for the months from September 2010 (the earliest payment due) until October 2011 (the latest payment due when the proceeds were received), applied in the order in which each payment became due; (2) all principal due for those same months, applied in the same order; (3) all escrow due for those same months, applied in the same order; (4) all late charges for delinquent months; (5) all inspection fees, reasonable attorney fees, and any other "costs and expenses" related to enforcement of the mortgage and note; and finally (6) the remaining principal balance on the note.

{36} The district court found that Wells Fargo received the insurance proceeds on October 5, 2011, but did not begin applying them to the mortgage account until October 11, 2011, keeping the majority of the insurance funds in a suspense account until November 21, 2011. According to the district court, Wells Fargo applied the

30

proceeds first to interest and principal due from September 2010 through July 2011. It then paid itself late fees and property inspection fees before applying funds to the months of August, September, and October 2011. It then paid the foreclosure attorney fees that had been invoiced before using the remaining funds to reduce the principal balance on the note.

{37} For several reasons, we conclude that there was substantial evidence that Wells Fargo misapplied the insurance proceeds in bad faith. First, we have already held in our UPA analysis that no fees were valid and that all damages flowed from Wells Fargo's actions with respect to the marketing and sale of the accidental death insurance policy. Thus, any application of insurance funds to fees of any kind was a misapplication that prevented the proceeds from paying off the note, leading instead to an improper reinstatement of the mortgage and all future interest and fees.

{38} Second, the district court's conclusion that Wells Fargo independently violated the terms of the mortgage by "using the insurance proceeds to pay its fees and costs before paying all interest and principal due[,]" is supported by Wells Fargo's "Mortgage Loan History," which was introduced at trial. We recognize that the court later admitted a visual aid, titled "Dollens Payment History," that specifies effective dates for each payment, appearing to contradict some of the dates on the "Mortgage Loan History" document. However, "only the trier of facts may weigh the evidence,

31

determine the credibility of witnesses, reconcile inconsistent or contradictory statements of witnesses, and decide where the truth lies." *Lewis*, 1981-NMSC-051, ¶ 4. The district court in its role as fact finder was free to refer to either document and to use the demonstrative exhibit as it saw fit.

{39} Third, Wells Fargo waited over a month to reduce the principal and interest on the note, according to one exhibit, or five days, according to the other. Wells Fargo did this in spite of Section 1 of the mortgage, which provides that "[p]ayments are deemed received by [Wells Fargo] when received at the location designated in the Note." There was evidence presented at trial that this practice unnecessarily allowed interest on the loan to accrue, artificially increasing the total owed when the payment was finally processed, and permitted at least one extra inspection fee to be charged to the account after the funds purportedly "reinstated" the mortgage to bring the loan current.

{40} A similar pattern emerged with respect to the February 13, 2012 payment. According to its own exhibit, Wells Fargo applied the first periodic payment for December 2011 on February 14 then inexplicably applied an inspection fee and "corporate advance fee" on that same day before applying the periodic payments for January and February 2012 on February 15. The funds went to fees out of the order provided for in Section 2, and an extra day of interest was unnecessarily accrued

32

before the January and February payments were processed. Wells Fargo has yet to offer any meaningful explanation for these accounting anomalies. The district court undoubtedly viewed these practices in the context of other inexplicable conduct established at trial, including the questionable billing practices related to property inspection and preservation, a series of billing statements that demanded amounts not due from the Estate, and Wells Fargo's maintenance of the foreclosure action for several months after the account was brought current. Against this backdrop, the district court heard testimony from a Wells Fargo employee that the account was handled in a "customary" manner. Thus, it was reasonable to conclude that these were not isolated errors but that Wells Fargo consistently and systematically acted in order "to increase its profits without regard for . . . Decedent or his family."

{41} For the above stated reasons, we conclude that punitive damages were available—independent of the UPA—for Wells Fargo's practices with respect to property inspection and preservation work orders and for its erroneous application of payments. Since the district court also relied on Wells Fargo's conduct related to the accidental death insurance policy as a basis for common law punitive damages, and since we have held that no common law claim affords liability for that conduct, remand is appropriate for the district court to reconsider punitive damages without reference to the accidental death insurance policy. *See Allsup's Convenience Stores,*

33

*Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 53, 127 N.M. 1, 976 P.2d 1 (stating that punitive damages are derivative of liability, compensatory damages, and a "culpable mental state indivisible from the conduct constituting liability" (internal quotation marks and citation omitted)).

**B.      Substantive Limits on the Award**

{42}      Since we are remanding this case for reconsideration of attorney fees and punitive damages, we need not evaluate the parties' arguments related to the substantive, constitutional aspects of the punitive damage award that we are setting aside. We only caution on remand that "the amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Aken*, 2002-NMSC-021, ¶ 23 (alteration, internal quotation marks, and citation omitted).

**Attorney Fees in *Duhigg***

{43}      In *Duhigg Law Firm v. Wells Fargo*, No. CV-2011-10129, the attorneys for the Estate were awarded $51,189.08 pursuant to the common fund doctrine for their efforts in pursuing the accidental death insurance benefits from Minnesota Life. "Under this doctrine, an attorney who creates a pool of funds for a group has the right to seek payment from the pool or seek proportional contribution from those who accept the benefits of the attorney's efforts." *Martinez v. St. Joseph Healthcare Sys.*,

34

1994-NMSC-030, ¶ 12, 117 N.M. 357, 871 P.2d 1363. The district court found that the attorneys' pursuit of the Minnesota Life funds resulted in the proceeds being paid to the benefit of Wells Fargo, which itself "made no attempt to appeal Minnesota Life's denial of benefits," or to contribute to the appeal in any way.

{44}     Wells Fargo makes two arguments: (1) the common fund doctrine is not available in a debtor-creditor relationship, and (2) the settlement order between the Estate and Minnesota Life acknowledges that $30,000 of the settlement was already designated to reimburse the attorneys for those same fees. It appears that neither of these arguments were preserved below, and we decline to address them for the first time on appeal. *See* Rule 12-213(A)(4); *see also Glaser v. LeBus*, 2012-NMSC-012, ¶ 13, 276 P.3d 959 (stating that an appellate court may decline to address an issue when an appellant fails to comply with Rule 12-213 by demonstrating that the issue was properly preserved for review).

**CONCLUSION**

{45}     We affirm the attorney fee award from *Duhigg Law Firm v. Wells Fargo*, No. CV-2011-10129. In *Dollens v. Wells Fargo*, No. CV-2011-05295, we remand for proceedings consistent with this Opinion. On remand, the district court should (1) reduce liability for out-of-pocket damages to $4,221.73, in accordance with the parties' stipulation; (2) allow Wells Fargo an opportunity to contest the

35

reasonableness of the attorney fee affidavit, ensuring, to the extent possible, that only recoverable fees—that is, fees related to the UPA claim, rather than any of the common law claims, the claims under the Home Loan Protection Act, or Section 48-7-24—are actually awarded; and (3) make any necessary reevaluation of punitive damages.

{46}    **IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**RODERICK T. KENNEDY, Judge**