# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-039**

**Filing Date: April 6, 2020**

**No. A-1-CA-37194**

**CHRISTOPHER J. DOLLENS,
individually and as Personal
Representative of the Estate of
James E. Dollens, Deceased, and
SANDRA EVANS,**

 Plaintiffs-Appellees,

v.

**WELLS FARGO BANK, N.A.,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Beatrice J. Brickhouse, District Judge**

Certiorari Dismissed, September 28, 2020, No. S-1-SC-38275; Conditional Cross-Petition Dismissed, September 28, 2020, No. S-1-SC-38275. Released for Publication October 5, 2021.

The Duhigg Law Firm
David L. Duhigg

Albuquerque, NM

Treinen Law Office, PC
Rob Treinen
Albuquerque, NM

Michael B. Browde
Albuquerque, NM

for Appellee

Holland & Hart LLP
Larry J. Montaño

Julia Broggi
Santa Fe, NM

Snell & Wilmer L.L.P.
Andrew M. Jacobs
Phoenix, AZ

for Appellant

**OPINION**

**VANZI, Judge.**

**{1}** Defendant Wells Fargo Bank, N.A. (Wells Fargo) appeals, on constitutional grounds, the district court's order awarding punitive damages to Plaintiffs in the amount of $2,500,000. Wells Fargo also appeals the district court's order awarding post-judgment interest to run from the date of the original judgment, entered February 14, 2014. We reverse and remand.

## BACKGROUND

**{2}** This litigation commenced in 2012, when Christopher Dollens (Dollens), individually and on behalf of the Estate of his father, James Dollens (Decedent), and Sandra Evans (collectively, Plaintiffs) brought suit against Wells Fargo and Minnesota Life Insurance Company (Minnesota Life) (collectively, Defendants) in connection with a mortgage accidental death insurance policy, and Wells Fargo's related misapplication of payments and foreclosure on the insured mortgage. Following a bench trial, the district court found for Plaintiffs, and Wells Fargo appealed. We affirmed in part, vacated in part, and reversed and remanded for the reasons set forth in *Dollens v. Wells Fargo Bank, N.A.* (*Dollens I*), 2015-NMCA-096, ¶¶ 2-8, 26-42, 356 P.3d 531. On remand, the district court conducted further proceedings and entered new judgments on attorney fees and punitive damages. Wells Fargo now appeals those judgments. *Dollens I* contains a detailed factual background, but for purposes of explaining the issues in this second appeal, we provide an updated summary of the facts and procedural history.

### The Initial Litigation

**{3}** Decedent took out a mortgage to buy a home in 2003. *Id.* ¶ 2. The mortgage was serviced by Wells Fargo, which later marketed and sold to Decedent the mortgage accidental death insurance policy (policy), underwritten by Minnesota Life. *Id.* The purpose of the policy was to "reduce or extinguish" the mortgage, through benefits paid to Wells Fargo, in the event of Decedent's accidental death. *Id.* Decedent died in August 2010. *Id.* ¶ 3. Dollens, as personal representative of the Estate, notified Wells Fargo that he would not be able to make the monthly mortgage payments and would have to sell the home in order to cover the Estate's debts. *Id.* Dollens then learned of the accidental death policy and submitted a claim on behalf of the Estate. *Id.* ¶ 4. Although

the Estate, and later Minnesota Life, notified Wells Fargo that a claim was pending under the policy, and although both parties requested that Wells Fargo delay or suspend any adverse action on Decedent's mortgage account, Wells Fargo commenced foreclosure proceedings in February 2011. *Id.* ¶¶ 3-5. Minnesota Life initially denied the claim under the policy, but then reversed its determination, paying Wells Fargo the benefits under the policy on October 5, 2011. *Id.* ¶ 5.

{4}    Meanwhile, Wells Fargo charged various costs and fees to Decedent's mortgage account, including late fees, attorney fees for the foreclosure, and charges for inspecting and preserving the property. *Id.* ¶ 6. Upon receiving the policy benefits from Minnesota Life, Wells Fargo paid some of the principal and interest on the note, and brought the loan current, but then—rather than paying off the remainder of the mortgage—paid itself for the above-mentioned fees and costs. *Id.* Wells Fargo then reinstated the mortgage with a reduced balance but did not dismiss the foreclosure action for several months. *Id.* The Estate made another payment on the mortgage, but was soon in default again, and made no further payments. *Id.* ¶ 7.

{5}    Plaintiffs brought claims against Defendants for breach of the mortgage contract, wrongful foreclosure, breach of the covenant of good faith and fair dealing, violations of the Unfair Practices Act (UPA), violations of the Home Loan Protection Act (HLPA), and for attorney fees and punitive damages. *Id.* ¶ 8. Plaintiffs settled with Minnesota Life but went to trial on the claims against Wells Fargo.[1] *Id.* Following a bench trial, the district court found in favor of Plaintiffs on all claims except the HLPA claim. *Id.* On February 14, 2014, the court awarded general damages to Plaintiffs in the amount of $15,633.42, attorney fees of $390,654.34, costs of $48,397.10, and punitive damages of $2,728,109.16. *Id.* With respect to punitive damages, the district court reached its figure by adding the compensatory damages and attorney fees and costs and multiplying the total times six. Wells Fargo appealed.

### *Dollens I*

{6}    We first reviewed Plaintiffs' UPA claim and upheld the district court's finding that Wells Fargo had violated NMSA 1978, Section 57-12-3 (1971), of the UPA through knowingly creating the perception that, in the event of a claim under a mortgage accidental death insurance policy, Wells Fargo would coordinate in some manner with Minnesota Life, and would not foreclose on an insured mortgage during the pendency of such a claim. *Dollens I*, 2015-NMCA-096, ¶¶ 13-18.

{7}    Second, we reversed the award of attorney fees holding that the district court had not afforded Wells Fargo a meaningful opportunity to litigate that issue. *Id.* ¶¶ 22-25. We noted that, while the UPA authorizes an award of attorney fees, the district court also

---

[1]The case was consolidated and tried together with a related action seeking fees for the Estate's attorneys under the common fund doctrine in connection with the Estate having secured the policy benefits from Minnesota Life (*Duhigg Law Firm v. Wells Fargo*, No. CV-2011-10129). *Id.* The district court found in favor of the Estate's attorneys and awarded separate fees of $51,189.08, which this Court affirmed on appeal. *Id.* ¶¶ 43-44. That judgment is not at issue in this appeal.

cited (in its initial letter decision) NMSA 1978, Section 48-7-24 (1983) as a basis for its fee award. *Dollens I*, 2015-NMCA-096, ¶¶ 22, 25. That section was inapplicable to Plaintiffs' claims, and did not authorize attorney fees. *Id.* ¶ 25. Moreover, no fees should have been awarded for the work allocated to Plaintiffs' common law breach of contract claims. *Id.* ¶ 23. We directed that, on remand, the district court should give Wells Fargo an opportunity to contest the reasonableness of the fee affidavit and should ensure, to the extent possible, that only fees related to the UPA claim were awarded. *Id.* ¶¶ 24, 45.

**{8}**     We then turned to the punitive damages award and discussed our concern that the district court had based its award of nearly $3,000,000 almost entirely on the uncontested attorney fee affidavit. *Id.* ¶ 24. We explained that punitive damages awards are subject to both procedural and substantive limitations. *Id.* (citing *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶¶ 11-12, 132 N.M. 401, 49 P.3d 662). Without deciding any substantive issues (including whether the attorney fees may properly be considered compensatory, for purposes of considering the ratio of compensatory to punitive damages), we held that, because Wells Fargo had been given no real opportunity to contest the bulk of the purported compensatory damages, the procedures used to reach the punitive damages award were lacking. *Id.*

**{9}**     We also addressed the parties' arguments regarding whether all, or only some, of Plaintiffs' claims should have formed the basis for the district court's punitive damages award. We affirmed the district court's finding that Wells Fargo breached the terms of the mortgage by charging unreasonable and unfounded property inspection and preservation fees. *Id.* ¶¶ 32-33. We held that punitive damages were available to deter Wells Fargo's demonstrated pattern of continued misconduct in charging such fees. *Id.* We also affirmed the district court's finding that Wells Fargo breached the terms of the mortgage and note. *Id.* ¶ 34. Specifically, Wells Fargo violated the express terms of those contracts by paying its own fees and costs before paying all interest and principal due as of the date the payments were received. *Id.* ¶¶ 34-41. This resulted in a default on the account after the insurance proceeds were received by Wells Fargo, when the insurance proceeds should instead have extinguished the mortgage. *Id.* ¶¶ 34, 37. Moreover, we held that there was substantial evidence that Wells Fargo acted in bad faith, such that punitive damages were available in connection with this claim. *Id.* ¶¶ 37, 41. Wells Fargo not only inappropriately prioritized its own fees and costs, but it also inexplicably delayed payments on the principal and interest in the mortgage account, allowing further interest and fees to accrue. *Id.* ¶¶ 38-40. Wells Fargo then maintained the foreclosure action for several months, even after the account was brought current, and made unjustified demands for payment from the Estate. *Id.* ¶ 40. There was testimony that such handling of a mortgage account was customary and not isolated or accidental, and thus it was reasonable to conclude that Wells Fargo acted systematically to increase its profits in reckless disregard of the impact on Plaintiffs. *Id.*

**{10}**     However, we reversed the district court's finding that Wells Fargo was a third-party beneficiary under the policy, and its finding that Wells Fargo had breached the covenant of good faith and fair dealing with respect to the policy. *Id.* ¶¶ 27-31. Accordingly, we held that no common law punitive damages could be imposed in

connection with those claims. *Id.* ¶ 31. We also held that the UPA claim could not form the basis for the punitive damages award, as the UPA is a separate remedial scheme with its own treble damages provision. *Id.* ¶ 26 (stating that "[t]o obtain punitive damages beyond those permitted by the statutory treble-damages provision, the plaintiff must establish a cause of action other than one under the UPA[,]" quoting *McLelland v. United Wis. Life Ins. Co.*, 1999-NMCA-055, ¶ 13, 127 N.M. 303, 980 P.2d 86).

**{11}** For the foregoing reasons, we set aside the punitive damages award and remanded to the district court for reconsideration of its award without reference to the UPA claim or the claims for breach of the accidental death insurance policy. *Id.* ¶ 41. We did not reach the substance of the punitive damages award but cautioned that "the amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Id.* ¶ 42 (quoting *Aken*, 2002-NMSC-021, ¶ 23). We also reduced the compensatory damages award to Plaintiffs, based on the parties' stipulation that Plaintiffs' actual out-of-pocket damages were $4,221.73, not $15,633.42 (as originally found by the district court). *Dollens I*, 2015-NMCA-096, ¶ 45.

**Proceedings on Remand**

**{12}** Following our resolution of Wells Fargo's appeal, on remand, the parties litigated the reasonableness of Plaintiffs' attorney fees. The district court issued a letter decision on August 3, 2016, finding that a 30 percent reduction to the total hours and fees reflected in the amended fee petition was appropriate to ensure that only recoverable fees were awarded. The district court entered an award of $325,380.61 in attorney fees, as well as $13,000 in post-petition attorney fees, and $54,143.07 in costs.

**{13}** The parties then briefed the issue of punitive damages. The district court entered an order on February 5, 2018, awarding Plaintiffs $2,500,000 in punitive damages. This time, the district court concluded that the attorney fees awarded under the UPA were not compensatory damages. However, the court was concerned that a punitive damages award of only six times the compensatory damage award (of $4,221.73, or approximately $25,330) would be de minimus and would not accomplish the court's goal of deterrence. The district court concluded that "[a] punitive damage award based on any ratio is problematic in this case[,]" and did not base its punitive damages award on the compensatory damages and/or the attorney fee award. It further stated that "tying punitive damages to fees detracts from the message the [c]ourt is attempting to communicate to Wells Fargo and any parties that in the future are considering similar conduct."

**{14}** The district court explained that the ratio between compensatory and punitive damages "is in many ways just a proxy to avoid a decision based on 'passion and prejudice[,]' " given the difficulty of knowing why a jury may have decided on any given award. In a bench trial, by contrast, the court enters findings and conclusions explaining the basis for its award. The district court set forth some of its reasoning as follows: (1) Wells Fargo acted willfully and its wrongdoing was customary and systemic; (2) Wells

Fargo showed a lack of understanding as to the significance and pervasiveness of its misconduct, which went "beyond any issues" related to the insurance policy; (3) a "per se" rule of smaller punitive awards for economic damages would merely incentivize parties like Wells Fargo to engage in economically efficient breaches of duty; (4) Wells Fargo made no argument that a punitive damages award of a particular magnitude would be a "death penalty," and therefore no amount awarded by the district court would threaten the company's ability to continue doing business; and (5) the attorney fees and costs, and the "effort required to get to this point" should not be overlooked. Following additional briefing by the parties, the district court also entered an amended order awarding Plaintiffs post-judgment interest of 15% on the $2,500,000 punitive damages award, to run from February 14, 2014.

**{15}**    Wells Fargo now appeals both the award of punitive damages and the order of post-judgment interest thereon.

**DISCUSSION**

**I.        Standards of Review**

**{16}**    The Due Process Clause of the Fourteenth Amendment to the United States Constitution "imposes certain limits, in respect both to procedures for awarding punitive damages and to amounts forbidden as grossly excessive." *Phillip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) (internal quotation marks and citation omitted); *Aken*, 2002-NMSC-021, ¶¶ 11-12, 19 (discussing the Due Process Clause's guarantee against the arbitrary deprivation of property, which requires both fair procedures for the imposition of punitive damages and "comparatively reasonable" awards). "Whether an award of punitive damages comports with constitutional due process is a question of law that we review de novo." *Yedidag v. Roswell Clinic Corp.*, 2013-NMCA-096, ¶ 29, 314 P.3d 243, *aff'd*, 2015-NMSC-012, ¶ 29, 346 P.3d 1136; *Aken*, 2002-NMSC-021, ¶ 19.

**{17}**    "We review the award of post-judgment interest for abuse of discretion." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 74, 146 N.M. 853, 215 P.3d 791. A district court abuses its discretion if it misapprehends or misapplies the law. *Id.*

**II.       Punitive Damages**

**{18}**    Wells Fargo argues that the district court's punitive damages award was unconstitutionally arbitrary and grossly excessive. Although Wells Fargo focuses primarily on the substantive excessiveness of the award, we address the arguments concerning procedural defects (arbitrariness) first. *Aken*, 2002-NMSC-021, ¶ 12 (determining that "in order to afford meaningful review of the substantive aspect of [a] punitive damages award . . . , we must ascertain that the procedures used to arrive at the award were fair"); *see also TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 486 (1993) ("[D]ue process does not simply require that a particular result be substantively

acceptable; it also requires that it be reached on the basis of permissible considerations." (O'Connor, J., dissenting) (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 41 (1991) (Kennedy, J., concurring))). In light of our conclusion that there were unconstitutional procedural defects in this case, we remand for further proceedings. Although we need not decide whether the punitive damages award was also substantively excessive, we address the issues raised by the parties to provide guidance on remand. *See State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 37, 136 N.M. 309, 98 P.3d 699 (addressing an issue likely to recur on remand in order "to provide guidance to the district court").

## A.     The District Court's Punitive Damages Award Violated Procedural Due Process Guarantees

**{19}**     The Due Process Clause of the Fourteenth Amendment entitles litigants to fair notice of conduct that may be punished by a state's punitive damages system, and fair notice of severity of the penalty that a state may impose. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a [s]tate may impose."). Furthermore, "[r]equiring the application of law" to a determination of punitive damages, "rather than a decisionmaker's caprice . . . helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself." *Id.* at 587 (Breyer, J., concurring). "Legal standards need not be precise" in order to supply litigants with adequate notice and fair treatment, but "they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior." *Id.* at 588; *see also Haslip*, 499 U.S. at 20 (holding that due process is satisfied where discretion is "exercised within reasonable constraints").

**{20}**     One such constraint is the requirement of a reasonable relationship between the punitive damages award and the harm that was or could have been caused to the plaintiff(s). *Haslip*, 499 U.S. at 22 (approving of Alabama's judicial review of jury awards to ensure that "punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages"); *Aken*, 2002-NMSC-021, ¶ 13 (approving of jury instructions including guidance that "punitive damages must relate to actual damages and the injury sustained"). Thus, New Mexico's jury instructions with respect to punitive damages provide, in part, as follows:

> Punitive damages are awarded for the limited purposes of punishment and to deter others from the commission of like offenses. The amount of punitive damages must be based on reason and justice taking into account all the circumstances, including the nature and enormity of the wrong and such aggravating and mitigating circumstances as may be shown. The property or wealth of the defendant is a legitimate factor for your consideration. *The amount awarded, if any, must be reasonably related to the injury and to any damages given as compensation and not disproportionate to the circumstances.*

UJI 13-1827 NMRA (emphasis added).

**{21}** Wells Fargo argues that the district court disregarded this constraint by refusing to examine the relationship between compensatory and punitive damages. We agree. Other than its statement that "a punitive award of six times the compensatory award would be de minimus," the district court did not address the relationship between Plaintiffs' actual damages and the punitive damages awarded. Instead, the district court stated in its order that "a punitive damage award based on the compensatory damages and/or the fee award would not be in the interest of justice." Thus, the district court's description of its own reasoning indicates that it rejected not only a consideration of the mathematical ratio between Plaintiffs' actual damages and punitive damages, but the necessity of any rational connection whatsoever between the two figures. We agree with the district court that the unique circumstances of this case render a "standard" ratio-based inquiry difficult, but—as we discuss further, below, through a limited examination of the substance of the punitive damages award—there must be *some* rational relationship between the injury *in this case* and the punitive damages award. The district court was not free to disregard this constraint on its discretion.

**{22}** Due process also requires that punitive damages must be "rational in light of their purpose to punish what has occurred and to deter its repetition." *BMW*, 517 U.S. at 587 (Breyer, J., concurring) (internal quotation marks and citation omitted). Although "[t]he property or wealth of the defendant is a legitimate factor" for the jury or judge's consideration, UJI 13-1827, given that "deterrence is directly related to what people can afford to pay[,]" *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996), punitive damages should not exceed the state's interest in deterrence. *Haslip*, 499 U.S. at 21; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419-20 (2003) (holding that "a more modest punishment for this reprehensible conduct could have satisfied the [s]tate's legitimate objectives, and the . . . courts should have gone no further"). The state's interest is limited to punishing for harm to the plaintiff(s) in the case at bar and deterring the defendant's conduct within the state. *See* UJI 13-1827A NMRA; *Philip Morris*, 549 U.S. at 354-55 (emphasizing that consideration of "potential harm" must be limited to the harm potentially caused to *the plaintiff*, and that a defendant may not be punished for harms it allegedly caused or may cause others); *BMW*, 517 U.S. at 572-73 (holding that "judicially imposed punitive damages" may only further the state's interest in protecting "its own consumers and its own economy" and may not impose sanctions for conduct unrelated to that interest). Thus, risk of harm to others, or to the public at large, while sometimes relevant to reprehensibility, is not relevant for any other purpose. *See* UJI 13-1827A comm. cmt.

**{23}** In arriving at its punitive damages figure, the district court in this case appears to have considered only avoiding an amount of punitive damages that might bankrupt Wells Fargo, rather than considering the amount that would accomplish *but not exceed* New Mexico's goals of punishment and deterrence. *See Haslip*, 499 U.S. at 21. Because Wells Fargo raised no argument about its wealth, the district court assumed that "any amount it awards will not threaten Wells Fargo's very existence." This, coupled with the district court's reference to findings that Wells Fargo services eight to nine

million home loans in the United States, and systemically, remorselessly mishandles mortgage accounts for its own profit, indicates that the district court's punitive damages award was aimed at deterring a national company with virtually unlimited assets from nationwide wrongdoing. This, again, violated Wells Fargo's right to a process constrained by fair and permissible considerations, namely: punishment for harm to *these* Plaintiffs, and deterring only conduct in *this* state.

**{24}**   Accordingly, we reverse and remand the district court's judgment on punitive damages, so that the court may reconsider its award within the constraints described hereinabove. However, as we have said, we also provide guidance on remand by addressing the substantive fairness of a punitive damages award in this context.[2]

## B.   Substantive Due Process Requirements

**{25}**   We evaluate whether a punitive damages award meets substantive due process requirements utilizing three guideposts established by the United States Supreme Court in *BMW*: "1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil [and criminal] penalties authorized or imposed in comparable cases." *Aken*, 2002-NMSC-021, ¶ 20 (citing *BMW*, 517 U.S. at 574-75); *see Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717. Our Supreme Court has held that the first two of these guideposts are akin to New Mexico's traditional considerations: examining "the size of the [punitive damages award] in light of the enormity and nature of the wrong considering aggravating and mitigating circumstances, and the relation between the amount of [punitive] damages and the actual injury or actual damages sustained." *Aken*, 2002-NMSC-021, ¶ 20. The guideposts are listed in descending order of importance: the first guidepost is the most important indicium of the reasonableness of a punitive damages award, and the last is the least important indicium. *Id.* ¶¶ 21, 25; *Chavarria*, 2006-NMSC-046, ¶ 39.

**{26}**   Wells Fargo argues that the district court's punitive damages award was excessive under the above guideposts on several grounds. First, as a sort of threshold argument, it argues that the district court erroneously engaged in additional fact-finding and/or went beyond the findings of fact available to support the imposition of punitive damages on remand. Second, it argues that the available findings of fact show no reprehensible conduct justifying a punitive damages award, or certainly not so large an award. Third, it argues that the 592:1 ratio between punitive damages and compensatory damages is grossly excessive. Finally, it argues that comparable civil or criminal penalties for the same conduct are far less than $2,500,000, showing that the punitive damages award here was excessive.

---

2We note that, while the *BMW* substantive due process guideposts are typically applied de novo in post-trial review, here, the parties structured their briefs to the district court (on the issue of punitive damages) around the *BMW* guideposts.

**{27}** Before addressing the three *BMW* guideposts, we reject Wells Fargo's contention that the district court impermissibly engaged in additional fact-finding or went "beyond" the facts found at trial in order to justify its punitive damages award. The first paragraph of the district court's order on punitive damages is essentially a statement that its original findings of fact were ultimate findings and that the evidence supporting those findings was properly reviewed by the court on remand. We agree. We directed the district court to permit Wells Fargo to challenge the reasonableness of Plaintiffs' claimed attorney fees on remand, and the district court complied with our directive, and entered new findings relating to attorney fees. We see no indication that Plaintiffs requested, or that the district court entered, any other new findings—which we assume explains the absence of detail in Wells Fargo's argument on this point.[3]

## 1.    Reprehensibility

**{28}** We also reject Wells Fargo's contention that, under the reprehensibility guidepost, the factual findings show *no* reprehensible conduct sufficient to justify the entry of a punitive damages award. Wells Fargo argues that the district court's "initial punitive damages ruling was based largely on Wells [Fargo's] conduct related to the [policy] and [Wells Fargo's] . . . violation of the UPA[,]" and that these findings were no longer available to support a punitive damages award on remand. This is incorrect. First, the majority of the district court's findings in support of its first punitive damages award did not pertain to the policy or Wells Fargo's violation of the UPA—they pertained to the mishandling of the mortgage account through assessing improper fees and misapplying payments. Furthermore, we made it clear in our prior opinion that "punitive damages were available—independent of the UPA—for Wells Fargo's practices with respect to property inspection and preservation work orders and for its erroneous application of payments." *Dollens I*, 2015-NMCA-096, ¶ 41.

**{29}** With respect to Wells Fargo's related argument that its conduct was not sufficiently reprehensible to justify a *substantial* punitive damages award, we again disagree. "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell*, 538 U.S. at 419. To evaluate whether a defendant's conduct is sufficiently reprehensible to warrant the imposition of punitive damages, courts must assess the potential aggravating factors (or, reprehensibility factors), namely, whether

> [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; [(5)] and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

---

3Wells Fargo refers only to Plaintiffs' brief in support of punitive damages, which cited the portions of the evidentiary record supporting the district court's previous findings of fact.

*Id.*; *see BMW*, 517 U.S. at 575-80 (referring to the foregoing considerations as "aggravating factors"). Regarding the first two factors, Wells Fargo argues that mere economic harm, which poses no threat to health or safety, weighs against a finding of significant reprehensibility. Wells Fargo further argues that there was no proof of financial vulnerability on the part of Plaintiffs, nor proof that Wells Fargo engaged in any deceitful conduct.

**{30}** While the presence of all five factors would show the *most* reprehensible conduct, all five are not required for a finding of significant reprehensibility. *BMW*, 517 U.S. at 576 (holding that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant a substantial penalty" (citation omitted)); *see, e.g., Chavarria*, 2006-NMSC-046, ¶ 37 (holding that a substantial punitive damages award was appropriate where harm was strictly economic, but the defendant's conduct was repeated, deceitful, and demonstrated "a reckless disregard for the welfare of a financially vulnerable family"). The district court here appeared to reject only Wells Fargo's argument that, where the conduct at issue causes no physical harm, and poses no threat to health or safety, such cases are *as a rule* "less worthy of large punitive damage[s] awards." We agree. *See Chavarria*, 2006-NMSC-046, ¶ 37.

**{31}** The Tenth Circuit cases cited by Wells Fargo for the proposition that courts are "virtually unanimous" in holding that the first two factors are required for a substantial punitive damages award are misquoted, or do not stand for the proposition cited, and are factually distinguishable. *See, e.g., Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 638 (10th Cir. 1996) (observing that the plurality in *BMW* "appear to regard torts causing only economic injury as less worthy of large punitive damages awards than torts inflicting injuries to health or safety"); *id.* at 638-39, 643 (nevertheless holding that a "substantial penalty" was warranted under the reprehensibility analysis, while acknowledging that, because the compensatory damages were $2,000,000, a $6,000,000 award was appropriate). The New Mexico cases cited are largely inapposite. *E.g., Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 50, 150 N.M. 283, 258 P.3d 1075 (merely listing the reprehensibility factors in the context of a wrongful death action); *Jolley v. Energen Res. Corp.*, 2008-NMCA-164, ¶¶ 32-34, 145 N.M. 350, 198 P.3d 376 (finding that three of the five aggravating factors weighed in favor of a substantial punitive damages award, again in a wrongful death case, but not addressing the distinction between cases involving economic versus noneconomic damages); *Weidler v. Big J Enters., Inc.*, 1998-NMCA-021, ¶ 48, 124 N.M. 591, 953 P.2d 1089 (citing *Cont'l Trend Res.*, 101 F.3d at 639-40, for the proposition that "[i]n economic injury cases, *if the damages are significant* . . . the ratio of punitive damages to the harm generally should not exceed ten to one" (emphasis added)). Indeed, *Muncey v. Eyeglass World, LLC*, cited by Wells Fargo, only highlights the absence of a rule that economic harm posing no risk to health or safety mandates a minimal punitive damages award. 2012-NMCA-120, ¶¶ 69, 72, 289 P.3d 1255 (upholding a punitive damages award of $2,000,000 in an economic harm case where only one aggravating factor was applicable).

**{32}** Turning to the other three aggravating factors under *Campbell*, Wells Fargo argues that the only evidence of Plaintiffs' financial vulnerability was the Estate's claim that it was unable to continue making mortgage payments following Decedent's death. But that claim was corroborated by the evidence. Wells Fargo's breaches of the mortgage contract were a cause of the account going into default, and the Estate repeatedly went into default after Decedent's death, whereas, before his death, payments had been timely made for over six years. *Dollens I*, 2015-NMCA-096, ¶¶ 2-3, 6-7. Wells Fargo's misconduct compromised the ability of Plaintiffs to pay off the mortgage, resulting in continued foreclosure proceedings, while Wells Fargo profited improperly and in violation of the mortgage contract. Wells Fargo's misconduct, by its very nature, affected a financially vulnerable family, and (because its conduct here was customary) affects similarly vulnerable families across New Mexico.

**{33}** With respect to the fourth and fifth factors, there was substantial evidence that Wells Fargo's conduct was intentional, pervasive, and recidivist. *Id.* ¶¶ 32-40. As discussed in our prior opinion, expert testimony and case law from other jurisdictions demonstrated that Wells Fargo had been "previously punished for similar conduct as early as 2007[,]" and that the improper fees, misapplication of benefits and other payments on the mortgage were customary. *Id.* ¶¶ 33, 40. We held that punitive damages were available to deter this pattern of willful, continued misconduct. *Id.* ¶ 41. There was also evidence that Wells Fargo's conduct involved deceit, because at least some of the fees routinely charged to the mortgage account were for services that were not only unnecessary, but not actually performed. *Id.* ¶ 32. Accordingly, we agree with Plaintiffs and the district court that these factors support a finding of significant reprehensibility and a substantial punitive damages award.

## 2. Ratio

**{34}** Our agreement that a substantial punitive damages award is warranted requires contextualization through the second guidepost—the relationship between compensatory damages and punitive damages. The focus of the district court under this guidepost must be to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426; *see also Aken*, 2002-NMSC-021, ¶ 23 (noting that the second *BMW* guidepost focuses on the injury to the plaintiff and the necessity of a rational relationship between that injury and the punitive damages award, and stating that "an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice" (internal quotation marks and citation omitted)); *see also BMW*, 517 U.S. at 580 (noting that "[t]he . . . most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff").

**{35}** Courts have "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 424. Generally, "few awards exceeding a single-digit ratio

between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425; *see also Chavarria*, 2006-NMSC-046, ¶ 38. On the other hand, though "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the [s]tate's goals of deterrence and retribution, than awards with ratios in a range of 500 to 1 . . . there are no rigid benchmarks that a punitive damages award may not surpass[.]" *Campbell*, 538 U.S. at 425. "[R]atios greater than those we have previously upheld may comport with due process where a 'particularly egregious act has resulted in only a small amount of economic damages.' " *Id.* (quoting *BMW*, 517 U.S. at 582); *Garcia v. Coffman*, 1997-NMCA-092, ¶ 41, 124 N.M. 12, 946 P.2d 216 (also citing *BMW*). The lodestar is the requirement of a reasonable relationship between the actual harm to the plaintiff and the punitive damages award. *See BMW*, 517 U.S. at 583 (noting that although there is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case[,] . . . a general concern of reasonableness properly enters into the constitutional calculus" under this guidepost (omission, alterations, internal quotation marks, and citation omitted)).

**{36}**   Here, Wells Fargo asserts that the district court's punitive damages award of $2,500,000, or approximately 592 times the $4,221.73 in compensatory damages, violates due process because this case does not "fall within a category of exceptional cases where more than single-digit ratios are constitutionally permissible." Wells Fargo argues that awards exceeding this range are only permissible where "(1) the conduct is particularly egregious; (2) the conduct causes only a small amount of economic damages; and (3) the damages are hard to detect or measure," citing *Campbell*, 538 U.S. at 425 (citing, in turn, *BMW*, 517 U.S. at 582). But *BMW*, in describing cases that may exceed the single-digit range, posed as examples cases in which "a particularly egregious act has resulted in only a small amount of economic damages[,]" and noted that "[a] higher ratio *may also be justified* in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." 517 U.S. at 582 (emphasis added). Thus, there is no authority for the proposition that all three of these factors must be present to justify a substantial award. Indeed, *BMW*'s next admonition is to "reiterate [the] rejection of a categorical approach." *Id.*

**{37}**   We generally agree with Plaintiffs' contention that Wells Fargo's conduct was both egregious and pervasive, and that the district court followed the logic of *BMW* and its progeny, recognizing that too small an award of punitive damages would create an incentive to engage in an "economically efficient" breach of duty in circumstances such as these, where the individual compensatory damages are small, and there is little incentive for a potential plaintiff to take on the costs of litigation. However, we issue some qualification and caution. We reject Plaintiffs' argument that the facts of this case "require the highest possible award of punitive damages." It must be acknowledged that this case is not comparable to the cases of brutal physical violence, rape, or racial discrimination. But neither do these extreme cases involve small economic awards underlying the punitive award, and accordingly, we do not think they were in the class of cases contemplated by *BMW*. We must therefore seek guidance to give content to the "reasonable relationship" requirement here.

**{38}** We think this case is somewhat comparable to *Chavarria*, in which a retailer of mobile homes committed fraud and conversion in the course of selling a mobile home to the plaintiffs, causing them an increased financial burden, and requiring them to live in substandard conditions. 2006-NMSC-046, ¶ 37. Although the damages awarded were only economic, our Supreme Court approved a ratio of approximately 14:1 in punitive to compensatory damages, or $250,000 to $17,000. *Id.* ¶¶ 35, 39. That case was egregious because it involved a "series of misrepresentations, forgeries, and fraudulent conduct" in the sale of the mobile home to the financially vulnerable plaintiffs. *Id.* ¶ 37.

**{39}** Though we do not express an opinion on whether Wells Fargo's conduct here was quite so brazen, it was nevertheless exploitative, deceptive, and willful, in all the ways we have already discussed. Moreover, although Plaintiffs' compensatory damages were lower, the costs of litigation were high, and there was evidence that Wells Fargo's treatment of Plaintiffs' mortgage account was customary. Accordingly, we do not hesitate to label Wells Fargo's conduct in this case as egregious. We also note that the Court in *Chavarria* took into account the "intangible" nature of some aspects of the harm the plaintiffs suffered. *Id.* ¶ 38. Here, similarly, Plaintiffs were subjected to the stress of Wells Fargo's mishandling of the mortgage account, immediately following the death of Decedent, and the resulting potential loss of that property in foreclosure. Accordingly, there is an "intangible" harm over and above the $4,221.73 in compensatory damages which is properly taken into account under this guidepost.

**{40}** Of course, the 14:1 ratio approved in *Chavarria* is a great distance from the 592:1 ratio imposed by the district court here, even acknowledging the unique aspects of this case, discussed above. Plaintiffs, apparently realizing this, argue that we should also consider the recoverable attorney fees and costs, together with the compensatory damages when comparing the punitive damages award to Plaintiffs' "actual harm." Plaintiffs explain that, even though the district court explicitly refused to base its punitive damages award on the attorney fees in this case, it did find that "the amount of fees and costs awarded is a relevant consideration in determining a punitive damage[s] award." The punitive damages award of $2,500,000 is 6.3 times the total costs, attorney fees under the UPA, and compensatory damages totaling $396,745.41,[4] which Plaintiffs contend is entirely within a constitutionally acceptable range. Wells Fargo argues that attorney fees, under the UPA or otherwise, are not compensatory; even if they were, where attorney fees are included as an element of compensation, courts typically impose only a 1:1 ratio of punitive to compensatory damages.

**{41}** We agree with Wells Fargo and the district court that "[f]ees awarded under the UPA are not compensatory damages." The UPA is a statutory scheme containing its own remedial provisions, including a treble damages provision, and a separate attorney fees provision. NMSA 1978, §§ 57-12-10(B), (C) (2005). Plaintiffs were awarded

---

4Even though the district court ostensibly did not base its revised punitive damages award on compensatory damages or the attorney fee award, the award of $2,500,000 is effectively "rounding up" from six times the total of damages, fees and costs ($396,745.41), which is $2,380,472.46—the amount requested by Plaintiffs in briefing on remand. Six to one was the ratio used by the district court in its first order.

attorney fees only for their UPA claim. Plaintiffs were separately awarded punitive damages for two of their common law breach of contract claims. We cannot see the logic of including the fees awarded pursuant to the UPA (for work relating to the UPA violation) as an aspect of the injury to Plaintiffs for purposes of comparison with punitive damages awarded for Plaintiffs' common law claims. In other words, the fees under the UPA were not to remedy the harm for which Plaintiffs have been awarded punitive damages.

{42}    However, we also acknowledge that the Tenth Circuit and other federal and state courts (though none, yet, in New Mexico) have taken into account "the probable expenses of litigation" for purposes of examining the relationship of punitive damages to actual damages. *See, e.g.*, *Cont'l Trend Res.*, 101 F.3d at 642 (holding that "the costs of litigation to vindicate rights is an appropriate element to consider in justifying a punitive damages award"). Frequently, these courts recognize that a wealthy defendant may litigate relentlessly and aggressively, in spite of modest stakes, causing the plaintiff to incur costs and expenses far beyond any compensatory damages award. *See id.*; *see also Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (observing that the defendants in such cases are "investing in developing a reputation intended to deter plaintiffs"). Even setting aside the attorney fees awarded under the UPA, Plaintiffs' additional attorney fees and costs in this case are well in excess of $100,000, or twenty-five times the compensatory damages of $4,222. However, given the absence of authority for the proposition that attorney fees should be included as an element of "actual damages" in this context, we do not include them in the denominator of the ratio between punitive damages and actual damages. Rather, these fees present a reasonable basis to exceed the presumably constitutionally permissible "single digit" ratio. *See Cont'l Trend Res.*, 101 F.3d at 642 (considering the estimated costs of litigation as further basis for a substantial attorney fee award, but not figuring the value of those costs into the second guidepost "ratio" analysis); *see also Mathias*, 347 F.3d at 676-78 (including the substantial defense costs as one reason that the 37.2:1 ratio of punitive to compensatory damages was not excessive, but not including the precise costs in the denominator for ratio purposes). In sum, we agree that the costs of litigation for Plaintiffs' claims for breach of the mortgage contract might place a reasonable punitive damages award beyond the single digits, and beyond the ratio approved in *Chavarria*, for this reason, and the others set forth above.

{43}    Another way that the district court in this case may ensure a rational relationship between punitive damages and compensatory damages is through comparing this case to other, similar cases. *See Lee*, 101 F.3d at 811-13 (looking to punitive damage awards in other cases to "find limits and proportions" in civil rights case where compensatory damages were nominal). Although we think it important to observe that this case did not involve only nominal damages—Plaintiffs were compensated for their financial losses—it did involve minimal economic compensatory damages, and some degree of intangible harm; significant litigation costs; and egregious, recidivist wrongdoing on the part of a large business that directly profited from its misconduct. On remand, the district court may wish to consider the punitive damages awarded in cases

with similar facts, to gain a sense of the range of reasonable punitive awards in such cases.

### 3.  Sanctions for Comparable Misconduct

{44}  "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, 517 U.S. at 583; *Aken*, 2002-NMSC-021, ¶ 25. The United States Supreme Court has held that "substantial deference" should be accorded "to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW*, 517 U.S at 583 (internal quotation marks and citation omitted). This relates to the third guidepost's purpose of ensuring that a defendant has fair notice of the penalty that might be imposed for its conduct. *See id.* at 584. On the other hand, we have noted criticism that this guidepost is "ineffective and very difficult to employ." *Aken*, 2002-NMSC-021, ¶ 25. Among other things, it is unclear how a court should proceed where there are no applicable "legislative judgments" regarding the conduct at issue. *Id.* Existing civil penalties may also be too low to have a reasonable deterrent effect on egregious conduct which a defendant should know is punishable through punitive damages. *See id.* (noting that "when statutory penalties for the conduct in question are low or do not exist, a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award" (internal quotation marks and citation omitted)); *see also Grassie*, 2011-NMCA-024, ¶¶ 52, 58-61 (noting that "New Mexico and other courts have not applied this factor vigorously" and holding, where a hospital's "aggravated" neglect of a patient caused his death, that no comparable sanctions sufficiently deterred the conduct at issue; thus, this guidepost was unhelpful to the constitutional analysis).

{45}  Plaintiffs have ignored this guidepost entirely, whereas Wells Fargo points us only to the UPA, citing *Bogle v. Summit Investment Co.*, 2005-NMCA-024, ¶ 36, 137 N.M. 80, 107 P.3d 520, in which this Court held that "[b]ecause of the similarity of the conduct prohibited by the [UPA] and the conduct engaged in by [the defendant], the remedies afforded under the [UPA] serve as a meaningful comparison in our determination of the reasonableness of the punitive damages awarded by the district court." Wells Fargo contends that its conduct here is likewise similar to conduct proscribed by the UPA, so the UPA's remedy of treble damages provides guidance for an appropriate punitive damages award in this case. We reject this argument. Plaintiffs had a separate UPA claim relating to Wells Fargo's misleading representations regarding the policy. But, as the district court succinctly stated, "Wells Fargo's misconduct goes beyond any issues that were related to the insurance policy." The conduct for which punitive damages were imposed on Wells Fargo pertained to improper fees assessed against Plaintiffs' mortgage account and Wells Fargo's misapplication of mortgage payments. Thus, the UPA does not provide a meaningful comparison in this case.

{46}  Given the absence of any other sanctions for purportedly comparable misconduct cited by the parties or the court in this case, we conclude that, as in *Grassie*, this

guidepost is largely unhelpful to the constitutional analysis. However we note that, under federal law, a bank such as Wells Fargo is subject to criminal punishment for fraudulent statements in its entries and transactions (such as, presumably, charging fees for services not actually performed). *See* 18 U.S.C. §§ 1001(a), 1005 (2018) (providing for penalties including up to a $1,000,000 fine, and imprisonment); *see also Aken*, 2002-NMSC-021, ¶ 27 (noting that "[t]he possibility of a jail sentence justifies a substantial punitive damages award"). More broadly, Wells Fargo's misconduct in this case was customary and recidivist, and Wells Fargo has cited no law for the proposition that there are some states in which Wells Fargo's conduct would have been legal. Accordingly, for purposes of notice, we conclude that Wells Fargo was on sufficient notice that it may be subject to a substantial punitive damages award in this state.

### III.    Post-Judgment Interest

**{47}**    Wells Fargo argues that the district court abused its discretion by imposing post-judgment interest on the punitive damages award from February 14, 2014 (the date of the original judgment) rather than from the date of the district court's order on remand, on February 5, 2018. Because we are vacating and remanding the punitive damages award, we need not necessarily decide this question. However, we do so hoping that this matter can be finally resolved on remand without further appellate review.

**{48}**    Wells Fargo contends that, under New Mexico law, if an appellate decision "leaves open the possibility that the trial court, upon reconsideration, might not enter a new damages award at all, then post-judgment interest only runs from entry of the new damages award." In *Dollens I*, this Court set aside the original punitive damages award, allowing the district court to reconsider its punitive damages award entirely, including whether or not to impose such damages. 2015-NMCA-096, ¶ 41. Accordingly, Wells Fargo contends, post-judgment interest should run from the date of the district court's new order: February 5, 2018. Plaintiffs disagree that this Court's opinion left open whether punitive damages should be imposed on remand; Plaintiffs contend that we affirmed the availability of punitive damages for specific claims, and that the district court understood that it was only modifying its judgment accordingly. Accordingly, Plaintiffs contend, post-judgment interest should run from the date of the original judgment.

**{49}**    Our Supreme Court has provided as follows, with respect to post-judgment interest:

> [t]he basic rule is that when this Court reverses and effectively wipes out all or a portion of a judgment, rendering it a nullity, and remands for new findings and the award of damages through the exercise of discretion, then interest accrues from the date of the new judgment; but with a mere modification, interest accrues from the date of the original judgment.

*Ulibarri v. Gee*, 1988-NMSC-093, ¶ 2, 107 N.M. 768, 764 P.2d 1326. In *Gee*, the court distinguished remanding to modify an excessive award of attorney fees, which only

requires the district court to "reconsider[] . . . facts as originally found[,]" from circumstances such as those in *Varney v. Taylor*, 1969-NMSC-175, 81 N.M. 87, 463 P.2d 511, where the proper damages on remand could not be ascertained "without a reconsideration of other evidence and new findings on issues not even considered originally." *Gee*, 1988-NMSC-093, ¶ 4. In *Varney*, our Supreme Court also observed the rule that "if the opinion only requires a modification of the former judgment (such as remittitur or additur), interest accrues at the date of the original judgment; but if we have reversed the former judgment, insofar as damages are concerned, and remanded for new findings and computation of the award, . . . then interest accrues from the date of the new judgment." 1969-NMSC-175, ¶ 6.

**{50}** In *Ulibarri v. Homestake Mining Co.*, 1991-NMCA-078, ¶¶ 7-8, 112 N.M. 389, 815 P.2d 1179, this Court addressed these principles in the context of a case that had initially been remanded for the correct apportionment of liability among the defendants. On remand, the district court was required to hold a hearing, take additional evidence concerning the correct apportionment of liability, and then apportion the previously determined damages. *Id.* ¶ 7. Following the entry of judgment on remand, there was a second appeal raising whether interest should run from the original judgment or the judgment on remand. We explained:

> [i]f it can be said that, on remand, there was nothing for the trial court to do but comply with the mandate, then the original order was merely modified, and interest accrues from the original order. If, however, the mandate contemplated further procedures below, . . . including the consideration of evidence other than that considered at trial, and the making of new findings, then the interest would accrue from the date of the judgment after remand.

*Id.* ¶ 6. Because, in that case, the district court had been required to undertake further proceedings and to enter appropriate findings in support of its order, we held that post-judgment interest would run from the second judgment, not the original judgment. *Id.* ¶¶ 8-9.

**{51}** Although this case has some distinguishing characteristics, we think our precedents require that post-judgment interest should, as a matter of law, run from the date of the second judgment. In *Dollens I*, we set aside the district court's award of attorney fees. 2015-NMCA-096, ¶ 45. We held that Wells Fargo must be given the opportunity to contest the reasonableness of the attorney fee affidavit through further proceedings, noting that Plaintiffs' uncontested attorney fee affidavit had largely "formed the basis for the punitive damage[s] award." *Id.* ¶¶ 24, 45. We did not address whether attorney fees under the UPA could be treated as compensatory damages for purposes of applying the *BMW* ratio in post-trial review. *Id.* ¶ 24. We also held that punitive damages were available for Plaintiffs' breach of contract claims concerning improper fees and the misapplication of mortgage payments, but not for Plaintiffs' other claims, and remanded for the district court to reconsider punitive damages "without reference

to" the UPA and policy-based claims. *Id.* ¶¶ 41-42. We also set aside the punitive damages award without analyzing its substantive fairness. *Id.* ¶ 42.

{52}　We cannot say that these directives required "mere modification" of the punitive damages award. *See Gee*, 1988-NMSC-093, ¶ 2. Rather, the district court was required to (1) make additional findings (with respect to attorney fees), which it may or may have considered as relevant to the punitive damages determination; (2) disregard other factual findings concerning the insurance policy (with respect to punitive damages); and (3) enter a new punitive damages award "through the exercise of discretion." *See Dollens I*, 2015-NMCA-096, ¶¶ 41, 45; *see also Gee*, 1988-NMSC-093, ¶ 2. Although we anticipated that the district court would enter a revised award of punitive damages, we left that determination wholly in the hands of the district court, which is evident from the language of our opinion, *Dollens I*, 2015-NMCA-096, ¶¶ 41, 45 (affirming that punitive damages were "available" for certain claims, and that the district court should make "any necessary reevaluation of punitive damages"), and the district court's order on remand, in which it stated that its task was to determine "*whether* the [c]ourt should award punitive damages, and if so, how much." Given these additional findings and proceedings, *see Ulibarri*, 1991-NMCA-078, ¶ 6, and because we gave the district court discretion with respect to the reevaluation of punitive damages on remand, we hold that post-judgment interest runs from the district court's order on remand: February 5, 2018.

**CONCLUSION**

{53}　We reverse and remand for further proceedings in accordance with this opinion.

{54}　**IT IS SO ORDERED.**

**LINDA M. VANZI, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**BRIANA H. ZAMORA, Judge**